## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2019, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Jonathan O. Chenoweth
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Slaton,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

April 16, 2019

Court of Appeals Case No.
18A-PC-1607

Appeal from the Vanderburgh Superior Court

The Honorable Robert J. Pigman, Judge.

Trial Court Cause No.
82D03-1604-PC-2070

**Tavitas, Judge.**

# Case Summary

William Slaton Jr. appeals the post-conviction court's ("PC court") denial of his petition for post-conviction relief ("PCR"). We affirm.

# Issues

Slaton raises two issues, which we restate as:

  I.   Whether Slaton was denied the effective assistance of appellate counsel.

  II.  Whether Slaton pleaded guilty involuntarily to the habitual substance offender allegation because he was not properly advised of his rights.

# Facts

The facts, as stated in Slaton's direct appeal, follow:

> On June 27, 2013, the Evansville Police Department received a report of suspected methamphetamine manufacturing at Slaton's address. Four officers arrived at the address and smelled a chemical odor, which they associated with the manufacture of methamphetamine, coming from the house. Officers Robert Hahn and Nick Henderson approached the house, which was divided into two apartments. The officers walked up onto the porch, which allowed access to doors belonging to each apartment.

> The officers first knocked on the door to the rear apartment, and a woman answered. The officers explained why they were at the house. The woman informed them that the odor was coming from next door and pointed them to the other apartment. The officers walked across the porch to the front apartment. The

door to that apartment was boarded up, but next to the door was an open window. Officer Hahn looked through the window and into the apartment that belonged to Slaton. He saw Slaton inside, carrying a glass jar toward the kitchen sink. Officer Hahn asked Slaton to stop. Slaton made eye contact with Officer Hahn, but Slaton, still holding the jar, continued more quickly toward the sink despite the officer's repeated requests to stop. At that point, Officer Henderson dove through the open window and grabbed Slaton.

The police detained Slaton and two other individuals located in the house. Once outside, Slaton consented to a search of the apartment. The search produced a number of items associated with the manufacture of methamphetamine, including: pseudoephedrine blister packs; lithium batteries; ammonium nitrate cold packs; aluminum foil; lye; acid-based drain cleaner; a glass jar with tubing attached to it; and several empty two-liter bottles. Additionally, 0.69 grams of methamphetamine was found in Slaton's bedroom.

The State charged Slaton as follows: Count 1, dealing in methamphetamine, a Class B felony; Count 2, maintaining a common nuisance, a Class D felony; and Count 3, dealing in methamphetamine, a Class B felony. The State also alleged that Slaton was an habitual substance offender. Slaton filed a pre-trial motion to suppress, which the trial court denied. A jury trial was held in September 2014, and the jury found Slaton guilty of attempted dealing in methamphetamine, a lesser included offense of Count 1, and guilty of possession of methamphetamine, a lesser included offense of Count 3. Slaton admitted to being an habitual substance offender. The trial court sentenced Slaton to fifteen years on Count 1, enhanced by three years due to his habitual substance offender status, and one and one-half years on Count 3, to be served concurrently with Count 1.

*Slaton v. State*, No. 82A05-1412-CR-589, slip op. at 2-4 (Ind. Ct. App. July 20, 2015) (footnote omitted).

[4] On direct appeal, Slaton raised two issues: (1) whether evidence admitted at trial was obtained as a result of an illegal search of Slaton's curtilage and residence, and (2) whether his sentence was inappropriate in light of the nature of his offenses and his character. We concluded that Slaton's Fourth Amendment rights were not violated and that his sentence was not inappropriate.

[5] In April 2016, Slaton filed a petition for post-conviction relief, which he later amended. Slaton argued that his appellate counsel rendered ineffective assistance of counsel because counsel failed to raise a jury instruction issue on direct appeal and that his guilty plea to being a habitual substance offender was involuntary because the trial court failed to advise Slaton of his rights. After a hearing, the PC court entered findings of fact and conclusions of law denying Slaton's petition for PCR. Slaton now appeals.

## Analysis

[6] Slaton appeals the PC court's denial of his petition for PCR. Our Supreme Court has stated:

> The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. To prevail on appeal from the denial of

post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. [Where, as here, a post-conviction court has made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we] do not defer to the post-conviction court's legal conclusions[.] A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made.

*Hollowell v. State,* 19 N.E.3d 263, 268-69 (Ind. 2014) (internal quotations and citations omitted). As the clearly erroneous standard "is a review for sufficiency of evidence, we neither reweigh the evidence nor determine the credibility of witnesses." *State v. Greene,* 16 N.E.3d 416, 418 (Ind. 2014). "Rather, we 'consider only the evidence that supports that judgment and the reasonable inferences to be drawn from that evidence.'" *Id.* (*quoting Ben-Yisrayl v. State,* 738 N.E.2d 253, 258-59 (Ind. 2000), *cert. denied,* 534 U.S. 1164, 122 S. Ct. 1178 (2000)).

## *I. Ineffective Assistance of Appellate Counsel*

Slaton argues that his appellate counsel rendered ineffective assistance by failing to raise a jury instruction issue on direct appeal. The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), *cert. denied*, 534 U.S. 830, 122 S. Ct. 73 (2001). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that: (1) his or her counsel's performance was deficient, and (2) the petitioner was prejudiced by the

deficient performance. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The failure to satisfy either prong will cause the claim to fail. *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006). Ineffective assistance of counsel claims, thus, can be resolved by a prejudice analysis alone. *Id.*

[8] Our Supreme Court has held that ineffective assistance of appellate counsel claims "generally fall into three basic categories: (1) denial of access to an appeal, (2) waiver of issues, and (3) failure to present issues well." *Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013). Slaton's claim is based upon the waiver of issues category. "To show that counsel was ineffective for failing to raise an issue on appeal thus resulting in waiver for collateral review, 'the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential.'" *Id.* (quoting *Ben-Yisrayl*, 738 N.E.2d at 260-61).

[9] To evaluate the performance prong when appellate counsel waived issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record; and (2) whether the unraised issues are clearly stronger than the raised issues. *Id.* "If the analysis under this test demonstrates deficient performance, then we evaluate the prejudice prong which requires an examination of whether 'the issues which . . . appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial.'" *Id.* (quoting *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997), *cert. denied*, 525 U.S. 1021, 119 S. Ct. 550 (1998)).

Slaton argues that the trial court improperly gave a jury instruction on attempted dealing in methamphetamine as a lesser-included offense, that he objected to the instruction, and that appellate counsel was ineffective for failing to raise the issue on direct appeal. We disagree. We conclude that the jury instruction issue was not clearly stronger than the issues raised by appellate counsel. Moreover, even if Slaton's appellate counsel had raised the jury instruction issue on direct appeal, the issue would not have been likely to result in a reversal of Slaton's convictions.

Our Supreme Court has developed a three-part test to determine whether to instruct a jury on a lesser-included offense of the crime charged. "First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser-included offense to determine if the alleged lesser-included offense is inherently included in the crime charged." *Fisher v. State*, 810 N.E.2d 674, 678 (Ind. 2004). "Second, if a trial court determines that an alleged lesser-included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged." *Id.* "If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense." *Id.* "Third, if a trial court has determined that an alleged lesser-included offense is either inherently or factually included in the crime charged, it must look at the evidence presented in the case by both parties to determine if there is a serious evidentiary dispute about the element or elements distinguishing the

greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater." *Id.*

[12] Here, Slaton argues only with respect to the third step.[1] According to Slaton, there was no serious evidentiary dispute that would have warranted instructing the jury on attempted dealing in methamphetamine. Slaton was charged with dealing methamphetamine, which, at the time of Slaton's offense, provided in part: "A person who: (1) knowingly or intentionally: (A) manufactures . . . methamphetamine, pure or adulterated, . . . commits dealing in methamphetamine, a Class B felony. . . ." Ind. Code § 35-48-4-1.1(a). The term "manufacture" means "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container." Ind. Code § 35-48-1-18.

[13] Slaton notes that "Indiana courts have consistently held that the manufacturing process need not be complete to violate the manufacturing statute." *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014). Slaton contends that the police officers smelled odors associated with a meth lab and found precursors, used reaction

---

[1] An attempt to commit an offense is inherently included in that offense. *See* Ind. Code § 35-31.5-2-168(2).

vessels, and methamphetamine. According to Slaton, "there was no dispute that meth had been made; at issue was whether it had been made by Slaton or Hale." Appellant's Br. p. 24. Slaton argues that, because manufacturing was in process, there was no evidence to support an attempted dealing methamphetamine instruction. The State, however, points out that our appellate opinion "makes it clear that there was no active lab at work when the police officers arrived at Petitioner's home, and Petitioner himself argued as such at trial." Appellee's Br. p. 15.

[14] The PC court found that the instruction was proper because a serious evidentiary dispute existed:

> In Petitioner's case, there was a serious evidentiary dispute regarding the extent of operations, when and if the operation occurred, and who performed what part of the operation. As noted by the Indiana Court of Appeals in its opinion and by trial counsel in her argument at sentencing, the evidence at trial established that there was no active lab at the time police arrived. One officer observed Petitioner walking with a glass jar toward the sink and Petitioner's subsequent refusal to follow his command to stop. In its later search, police discovered items associated with the manufacture of methamphetamine (pseudoephedrine blister packs, lithium batteries, ammonium nitrate cold packs, aluminum foil, lye, drain cleaner; a glass jar with tubing attached, and several empty two-liter bottles). However, a complete and intact operational lab was not present. Officers noted a smell before entering but no smoke, heat or other evidence of active "cooking" was observed once they had made entry. No methamphetamine was in production at that time, and the two-liter bottles were empty of any partially finished or finished product. Officers located less than a gram of methamphetamine in a separate room, and there was no

evidence that it or the "pill dough," a by-product of the methamphetamine cooking process, found in the toilet were from the possible lab components. Nor was there evidence that the "pill dough" had been recently produced or placed in the toilet. While there was a scintilla of evidence that a lab had been active sometime prior to officers' entry, it is questionable whether the State could prove beyond a reasonable doubt that the lab had been in operation while Petitioner was present. This conclusion is consistent with the fact that the jury did in fact convict Petitioner of attempted dealing only.

Appellant's App. Vol. II pp. 11-12. The PC court concluded that the jury instruction issue was not clearly stronger than the issues raised on direct appeal and that Slaton failed to demonstrate appellate counsel's performance was deficient.

[15] As we noted in our opinion in Slaton's direct appeal, when officers entered Slaton's residence, they found many precursors needed to manufacture methamphetamine, and they found a small amount of methamphetamine in a bedroom. They did not, however, discover an active methamphetamine lab. The PC court's conclusion that a serious evidentiary dispute existed as to whether Slaton committed dealing methamphetamine or attempted dealing methamphetamine is not clearly erroneous.

[16] Given the serious evidentiary dispute, the jury instruction issue was not clearly stronger than the Fourth Amendment and sentencing issues raised by appellate counsel on direct appeal. Moreover, even if appellate counsel had raised the jury instruction issue on direct appeal, Slaton failed to demonstrate that the outcome of the appeal would have been different. The PC court properly

denied Slaton's petition for PCR on his claim of ineffective assistance of appellate counsel.

## II. Involuntary Guilty Plea

[17]     Next, Slaton argues that his guilty plea to the habitual substance offender allegation was involuntary. A post-conviction proceeding is a proper vehicle for challenging a guilty plea, and we look at the evidence before the post-conviction court that supports its determination that a guilty plea was voluntary, intelligent, and knowing. *Moffitt v. State*, 817 N.E.2d 239, 248-49 (Ind. Ct. App. 2004), *trans. denied*. According to Slaton, the guilty plea was involuntary because the trial court did not inform him of his rights pursuant to *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709 (1969). *See Hall v. State*, 849 N.E.2d 466, 469 (Ind. 2006) ("*Boykin* requires that the record must show, or there must be an allegation and evidence which show, that the defendant was informed of, and waived, three specific federal constitutional rights: the privilege against compulsory self-incrimination, right to trial by jury, and the right to confront one's accusers."); *see also* Ind. Code § 35-35-1-2.[2] The State,

---

[2] At the time of Slaton's offense and trial, Indiana Code Section 35-35-1-2(a) provided:

> The court shall not accept a plea of guilty or guilty but mentally ill at the time of the crime without first determining that the defendant:
>
> (1) understands the nature of the charge against the defendant;
>
> (2) has been informed that by the defendant's plea the defendant waives the defendant's rights to:
>
>   (A) a public and speedy trial by jury;
>
>   (B) confront and cross-examine the witnesses against the defendant;
>
>   (C) have compulsory process for obtaining witnesses in the defendant's favor; and

however, argues that Slaton did not plead guilty to the habitual substance offender allegation; rather, Slaton stipulated to the facts and a *Boykin* advisement was not required.

[18] After the jury found Slaton guilty, the following discussion occurred outside the presence of the jury:

> BY COURT: Okay. Have the parties talked about - everybody can be seated. Have the parties had any conversation about the remaining Count [the habitual offender count]?
>
> [Deputy Prosecutor]: Judge with respect to the remaining count the terms of years is three to eight years. The State is willing to make an offer on the HSO if Defendant pleads of [sic] three years with the Court to determine placement.
>
> BY COURT: Okay.

---

> (D) require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant may not be compelled to testify against himself or herself;
>
> (3) has been informed of the maximum possible sentence and minimum sentence for the crime charged and any possible increased sentence by reason of the fact of a prior conviction or convictions, and any possibility of the imposition of consecutive sentences;
>
> (4) has been informed that the person will lose the right to possess a firearm if the person is convicted of a crime of domestic violence (IC 35-31.5-2-78); and
>
> (5) has been informed that if:
>
> (A) there is a plea agreement as defined by IC 35-31.5-2-236; and
>
> (B) the court accepts the plea;
>
> the court is bound by the terms of the plea agreement.

[Deputy Prosecutor]: But there needs to be a decision because the jury is waiting.

BY COURT: Right. You want to talk to your client about that?

[The parties then arrange a meeting between defense counsel and Slaton]

BY COURT: Okay. All right. Come and get me when you're finished.

* * * * *

[Defense Counsel]: Mr. Slaton I have advised you that the State has offered you a plea deal for three years and at this time after hearing the maximum and the minimum that you can serve if you go to trial on this what would you like to do?

BY DEFENDANT: Take the three I guess.

[Defense Counsel]: He wants to take the three year offer.

BY COURT: Okay. Is that a voluntary act on your part sir?

BY DEFENDANT: Yeah (affirmative) as much as I hate to even do time at all.

BY COURT: Okay. Well it's an enhancement of your sentence so if you appeal your sentence and you get it reversed then this goes away. Do you understand that?

BY DEFENDANT: I know.

BY COURT: Okay. And so you admit that you have those two misdemeanor marijuana possession charges?

BY DEFENDANT: Yes.

BY COURT: Okay. And that you - you'd have a right to a hearing on that and your Counsel would be here, you'd have a right to question the evidence just like you did at the trial. Do you understand all that? Do you understand that sir?

BY DEFENDANT: Yeah (affirmative).

BY COURT: Okay. All right. And you want to go ahead and admit that that petition they've filed is true, is that right?

BY DEFENDANT: Yes.

BY COURT: Okay. Let's set a sentencing date then. We'll show an admission. Let's set a sentencing date for . . .

Trial Tr. Vol. pp. 402-05.

[19] The chronological case summary provides a "Plea Guilty" disposition of the habitual substance offender allegation on the day of the trial. Appellant's Direct Appeal Suppl. App. p. 72. At sentencing, however, the CCS provides: "Defendant admitted to the Habitual Substance Offender count during Trial by jury." *Id.* at 73. The trial court's sentencing order provides both a "Plea Guilty" with respect to the habitual substance offender allegation and that "Defendant admitted to the Habitual Substance Offender count during Trial by Jury." Direct Appeal App. Vol. I p. 125.

[20] The PC court found that Slaton did not, in fact, plead guilty. Rather, the PC court found Slaton's situation "nearly identical" to the situation in *Hopkins v. State*, 889 N.E.2d 314 (Ind. 2008), and concluded:

> The trial transcript establishes that after the jury found Petitioner guilty of two charges, the State offered that it would agree to a sentence of three (3) years with the Court to determine placement for execution of the sentence if Petitioner admitted to "the HSO." After discussions with trial counsel, Petitioner agreed to do so. The jury was still present in the jury room and the State had witnesses and exhibits. The State submitted its evidence to trial counsel who was granted time to review and discuss the evidence and its implications and consequences with Petitioner. Petitioner then admitted the two (2) misdemeanor convictions for possession of marijuana that were listed on the documents and confirmed that he was doing so voluntarily. After further inquiry, he also admitted that the State's allegations in its pleading were true – that the convictions were prior and unrelated as set forth in the statute. Because Petitioner did not plead guilty but rather stipulated to facts, the Court was not required to confirm Petitioner had been advised of and waived any specific rights before accepting his admission. Consequently, Petitioner had failed to carry his burden of proof as to this allegation.

Appellant's App. Vol. II pp. 13-14.

[21] In *Hopkins*, the defendant challenged his habitual offender status in a petition for PCR. He argued that his "guilty plea" to the habitual offender allegation was not voluntary and intelligent because he was not advised of his rights under *Boykin*, including his right against self-incrimination, the right to trial by jury, and the right to confront his accusers. The parties, however, contested whether

the defendant had entered into a guilty plea or a stipulation of facts. The post-conviction court determined that the defendant had entered into a stipulation of facts, not a guilty plea. Consequently, the defendant was not required to be advised of his *Boykin* rights.

[22] On appeal, our Supreme Court noted the following:

> After the jury returned its verdict on the principal charges back in 2000, Hopkins and his lawyers indicated a desire to waive trial by jury on the habitual allegation. There followed a discussion between the trial court, counsel, and the defendant.
>
> MR. GELLER: Yes, Judge, (inaudible). . . . Judge, my client will admit to the elements involved in the habitual offender.
>
> \* \* \* \* \* \*
>
> THE COURT: Mr. Hopkins, you're aware that you have the continuing right to have this phase of the trial determined by the Jury which has previously been sworn in this cause—is that correct?
>
> DEFENDANT ANTHONY HOPKINS: Yes.
>
> THE COURT: And it's your choice to waive that jury trial and to proceed by stipulation and admit your guilt on the—or admit that the State has proven the habitual offender sentence enhancement—is that correct, sir?
>
> DEFENDANT ANTHONY HOPKINS: Is it—can I ask you a question on this?

THE COURT: Um hum . . . .

DEFENDANT ANTHONY HOPKINS: As far as me pleading guilty on that. If I appeal my case and over turn [sic] it—does that still stand—if I plead guilty for the habitual?

* * * * * *

THE COURT: Okay—it is correct that if you appeal and the Court of Appeals over turns [sic] the conviction upon which the Court attaches the sentencing enhancement, then that's out—because it's not a new crime. It's enhancement of that sentence. It is also possible that the Court of Appeals could reverse and remand for retrial—if the reversal wasn't for insufficiency of the evidence. So, it could get reversed. It could come back and we could retry that count in theory and then the sentencing enhancement could again attach. Do you understand that?

DEFENDANT ANTHONY HOPKINS: Yes, ma'am.

* * * * * *

THE COURT: Okay—I believe I asked you, but let me repeat or—just to cover my bases, that you have the right to—continuing right to counsel throughout the habitual phase of this trial. Do you understand that?

DEFENDANT ANTHONY HOPKINS: Yes, ma'am.

THE COURT: Okay. Do you want to proceed with the stipulation of the habitual sentencing enhancement at this time?

DEFENDANT ANTHONY HOPKINS:  Yes, ma'am.

[The State then set forth the dates of the commission, conviction, and sentencing of the three felony offenses used to establish Hopkins' habitual offender status, and the exhibits were admitted into evidence without objection from Hopkins.]

THE COURT:  Okay, Mr. Hopkins, is that true as stated by the Prosecutor?

DEFENDANT ANTHONY HOPKINS: Yes, ma'am.

\* \* \* \* \* \*

THE COURT:  Okay, the Court finds that the State has proven that Anthony Hopkins accumulated three—two or more—in this case, three, prior unrelated felony convictions. The commission, conviction and sentencing on the first occurring before the commission, conviction and sentencing [on the second]; the second which occurred before the commission, conviction and sentencing on the third—all of which occurred before the commission and conviction of Mr. Hopkins in the present case.  And we will show that the sentence enhancement has been—habitual sentence enhancement has been proven.

(Tr. at 737-47 (emphasis added).)  The trial court then brought the jurors back into the courtroom and informed them what had just transpired: "Okay—the good news is that [phase two] of this trial, the Defendant [ ] and the State resolved by stipulation or admission." (*Id.* at 748 (emphasis added).)  The Court then dismissed the jury and eventually imposed additional years for the habitual.

*Hopkins*, 889 N.E.2d at 315-17. Our Supreme Court agreed with the post-conviction court and held that the "post-conviction court's determination that what occurred was a stipulation rather than a plea should stand." *Id.* at 317.

[23] We agree that this case is much like *Hopkins*. As in *Hopkins*, the trial court and the parties here mentioned both guilty pleas and admitting prior convictions. Slaton attempts to argue that he was in fact pleading guilty because, in addition to admitting to the underlying prior offenses, he also admitted that the petition was true. The petition alleged that Slaton had two prior substance offenses, which were Class A misdemeanors or Class D felonies and were unrelated to the current substance offenses charged. The PC court found that Slaton was merely admitting "that the State's allegations in its pleading were true – that the convictions were prior and unrelated as set forth in the statute." Appellant's App. Vol. II p. 102.

[24] As in *Hopkins*, although the trial court could have been much clearer here in the procedure it was following, we cannot say that the PC court's conclusion is clearly erroneous. Because the PC court determined that the procedure here was a stipulation rather than a guilty plea, the *Boykin* advisements were not required. The PC court's denial of Slaton's PCR petition on this issue is not clearly erroneous.

## Conclusion

[25] The PC court's denial of Slaton's petition for PCR is not clearly erroneous. We affirm.

Affirmed.

Baker, J., and May, J., concur.