## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 30 2019, 10:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Assistant Section Chief, Criminal
Appeals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gabriel E. Hallman, *Appellant-Defendant,* | September 30, 2019 |
| v. | Court of Appeals Case No. 19A-CR-426 |
| | Appeal from the Tippecanoe Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Randy J. Williams, Judge |
| | Trial Court Cause No. 79D01-1702-F1-2 |

**Najam, Judge.**

# Statement of the Case

Gabriel Hallman appeals his conviction and sentence for neglect of a dependent, as a Level 1 felony, following a jury trial. Hallman presents the following issues for our review:

> 1. Whether the trial court abused its discretion when it admitted into evidence testimony that Hallman had previously threatened to kill his stepson Z.H.
>
> 2. Whether the trial court committed fundamental error during the State's closing argument.
>
> 3. Whether the State presented sufficient evidence to support his conviction.
>
> 4. Whether the trial court abused its discretion when it sentenced him.
>
> 5. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

# Facts and Procedural History

In 2012, Hallman married Tiphani Jennings. In April 2015, Jennings gave birth to a son, Z.H., but Hallman was not Z.H.'s biological father. In October 2015, Hallman, Jennings, and Z.H. moved into an apartment with Dominic Fultz and Krystin Johnson in Lafayette. At some point, Hallman became unemployed, so he took care of Z.H. when Jennings was at work. On one occasion in late Summer or early Fall of 2015, Hallman called Jennings' mother

and asked her to watch Z.H. She refused, but Hallman brought Z.H. to her house and told her, "if you don't watch him, fine, I'll fucking kill him." Tr. Vol. 2 at 91.

[4] On October 21, Jennings went to work and left Z.H. in Hallman's care. At around 3:00 a.m. the next morning, Hallman left Z.H. in his crib and went to pick up Jennings from work. When Hallman left, Johnson was asleep in a room across the hall from Z.H. When Jennings got home, she checked on Z.H. and observed that he had a "dead stare," and Z.H. had defecated "three times everywhere all over" their bed. *Id.* at 65. Against Hallman's wishes, Jennings insisted that they take Z.H. to a local emergency room. There, Z.H. was diagnosed as being constipated and dehydrated and as having a possible respiratory infection. Upon his discharge from the emergency room at approximately 8:00 a.m., Z.H. was not having difficulty breathing.

[5] Later that morning, at approximately 10:15 a.m., Jennings left the apartment, and she left Z.H. with Hallman in the living room. Fultz was asleep upstairs. Only a few minutes after Jennings left, Z.H. "went limp," and Hallman called 9-1-1. *Id.* at 122. Hallman performed C.P.R. on Z.H., and when emergency medical personnel arrived, Z.H. was not breathing and had no pulse. En route to a local hospital, Z.H. regained a pulse, but he still had no heartbeat and was not breathing. Z.H. was transported by helicopter to Peyton Manning Children's Hospital in Indianapolis. Once there, Z.H.'s pupils were fixed and dilated, which was indicative of trauma to his head. Z.H. was removed from life support two days later and died. A forensic pathologist subsequently

determined that Z.H. died as a result of blunt force trauma to the head caused by a "direct blow injury." *Id.* at 244. And the pathologist concluded that Z.H.'s death was a homicide.

[6] The State charged Hallman with two counts of neglect of a dependent, one as a Level 1 felony and one as a Level 3 felony; and three counts of battery, one as a Level 2 felony, one as a Level 3 felony, and one as a Level 5 felony. A jury found Hallman guilty as charged, but the trial court entered judgment of conviction only on one count of neglect of a dependent, as a Level 1 felony. The court sentenced Hallman to thirty-nine years executed. This appeal ensued.

# Discussion and Decision

### *Issue One: Prior Threat to Kill Z.H.*

[7] Hallman first contends that the trial court abused its discretion when it admitted Jennings' mother's testimony that Hallman had threatened to kill Z.H. approximately four or five weeks before Z.H.'s death. Hallman concedes that that testimony "might have [had] some minimal evidentiary value to demonstrate motive or relationship of the parties," but he insists that "its prejudicial effect greatly outweighs any evidentiary value." Appellant's Br. at 21. We cannot agree.

[8] As our Supreme Court has explained:

> Generally, a trial court's ruling on the admission of evidence is accorded a great deal of deference on appeal. Because the trial

court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and only reverse if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015) (citations and quotation marks omitted).

[9]     Indiana Evidence Rule 404(b) generally prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

> Evidence Rule 404(b) is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. *Halliburton v. State*, 1 N.E.3d 670, 681 (Ind. 2013) (citing *Byers v. State*, 709 N.E.2d 1024, 1026-27 (Ind. 1999)). Or, as stated in *Bassett v. State*, 795 N.E.2d 1050, 1053 (Ind. 2003), the purpose behind Evidence Rule 404(b) is to "prevent[ ] the State from punishing people for their character, and evidence of extrinsic offenses poses the danger that the jury will convict the defendant because . . . he has a tendency to commit other crimes." (Internal quotation omitted). In assessing the admissibility of evidence under Evidence Rule 404(b), the trial court must first determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and then balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Halliburton*, 1 N.E.3d at

681-82 (citing *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind. 2002)). The effect of Rule 404(b) is that evidence is excluded only when it is introduced to prove the forbidden inference of demonstrating the defendant's propensity to commit the charged crime. *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*.

*Laird v. State*, 103 N.E.3d 1171, 1177 (Ind. Ct. App. 2018), *trans. denied*.

[10] Here, the State contends that the challenged evidence was not admitted to show Hallman's propensity to commit attempted murder; rather, it was admitted to show Hallman's motive, his state of mind, and his relationship with Z.H. *See id.*; Evid. R. 404(b). Evidence of motive is always relevant in the proof of a crime. *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996). A defendant's prior bad acts are also usually admissible to show the relationship between the defendant and the victim. *Id.*

[11] As the State correctly points out, our Supreme Court has twice held that a defendant's threat to kill his victim months before a murder was admissible under Trial Rules 403 and 404(b). In *Ross*, the defendant had threatened to kill his ex-wife two months before he murdered her. The trial court permitted that evidence at Ross' trial, and, on appeal, the Court held that "[t]he trial court clearly acted within the bounds of its discretion in admitting th[at] evidence." 676 N.E.2d at 346. And in *Berry v. State*, the trial court admitted into evidence testimony that the defendant had threatened to kill his parents six months before he murdered them. 704 N.E.2d 462, 464 (Ind. 1998). On appeal, the Court observed that the defendant's prior threat "was presented as part of more general testimony about the relationship between the defendant and the rest of

his family," and the Court held that the trial court did not abuse its discretion when it admitted the evidence.  *Id.*

[12]   Here, the State presented testimony that Hallman frequently complained about having to care for Z.H.  Hallman also complained to Jennings that Z.H. cried too much.  On one occasion, Hallman "didn't want to watch" Z.H. and dropped him off with Jennings at her place of employment.  Tr. Vol. 2 at 62.  In addition, Jennings testified that she and Hallman sometimes argued about the fact that Hallman was not Z.H.'s biological father.  In the context of this general testimony, Jennings' mother's testimony that Hallman had threatened to kill Z.H. when she refused to take over the care of Z.H. for Hallman approximately four to five weeks before Z.H.'s death was relevant to show Hallman's relationship with Z.H. and his motive in committing neglect of a dependent.  And we hold that the probative value of that evidence outweighed any prejudice to Hallman.  *See Laird*, 103 N.E.3d at 1177; *see also Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017) (stating trial court has "wide discretion" in making Rule 403 determination).  Thus, the trial court did not abuse its discretion when it admitted the challenged evidence.

### Issue Two:  Fundamental Error

[13]   Hallman next contends that the trial court committed fundamental error during the State's closing argument at trial.  The prosecutor stated in relevant part as follows:

> That's why Dr. Cavanaugh's manner of death conclusion was homicide.  Not undetermined, not accident, it was homicide

because something had to have been done to him in order to inflict such an injury. We also know this because if it was an accident that happened while the baby was in the defendant's care, *the defendant never provided a reasonable explanation for what did happen*. He . . . had an opportunity, he talked to Detective Pinkard, Detective Pinkard even asked him after he came up with the examples of the softball three or four weeks prior which we know unequivocally could not have caused the injury. Detective Pinkard asked, asked him, was there anything, any accident that happened after the girls left that morning that could have caused this? No.

Tr. Vol. 3 at 23-24 (emphasis added). Hallman maintains that the prosecutor's reference to Hallman's failure to provide a reasonable explanation for what happened to Z.H. was an improper reference to Hallman's failure to testify, which constituted prosecutorial misconduct. Because Hallman did not object to the remark, he alleges fundamental error on appeal.

[14] As our Supreme Court has explained,

[i]n reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an

admonishment to the jury, and if further relief is desired, move for a mistrial.

*Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, waived for failure to preserve the claim of error.* The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." The element of such harm is not established by the fact of ultimate conviction but rather "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible.

We stress that "[a] finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have. . . ." Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense

counsel who ignorantly, carelessly, or strategically fail to preserve an error.

*Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind. 2014) (emphasis added, citations and footnotes omitted).

[15]  Here, Hallman makes thorough and cogent argument on the question of prosecutorial misconduct, but his argument on the question of fundamental error is woefully inadequate, and he has waived this issue for our review. After citing *Ryan* for the principle that fundamental error is a "narrow exception to the waiver rule" and requires him to show that "the error is so prejudicial to the defendant's rights as to make a fair trial impossible," Hallman's entire argument consists of the following: "It seems to this author that requiring Hallman to prove that he was not guilty by providing evidence that the incident was an accident—constitutes prejudicial error. Hallman was not entitled to a perfect trial, but he was entitled to a fair one." Appellant's Br. at 19. Because Hallman has not made cogent argument in support of his fundamental error claim, it is waived.

[16]  Waiver notwithstanding, taken in context, the prosecutor's reference to Hallman's failure to provide a reasonable explanation for Z.H.'s injuries to law enforcement and others during the investigation was not an improper reference to Hallman's failure to testify at trial. And, even if it were, the remark could not be characterized as so blatantly improper as to "present an undeniable and substantial potential for harm" to Hallman such that the trial court should have

*sua sponte* ruled that the prosecutor had committed misconduct. *Ryan*, 9 N.E.3d at 668.

### Issue Three: Sufficiency of the Evidence

Hallman next contends that the State presented insufficient evidence to support his conviction. When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Meehan v. State*, 7 N.E.3d 255, 257 (Ind. 2014).

> "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. [T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict."

*Id.* (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

To prove neglect of a dependent, as a Level 1 felony, the State was required to show that Hallman had the care of Z.H., who was a dependent under the age of fourteen, and he knowingly or intentionally placed Z.H. in a position that endangered Z.H.'s life or health and which resulted in Z.H.'s death. Ind. Code § 35-46-1-4 (2015). On appeal, Hallman challenges the sufficiency of the evidence to prove either that he placed Z.H. in a situation that endangered his life or health or that he was the person who neglected Z.H. We address each contention in turn.

*Endangerment*

[19] Hallman asserts that "the Neglect of a Dependent statute does not apply to this instant fact situation as there is simply no evidence to demonstrate that Hallman placed [Z.H.] in a situation that endangered [Z.H.'s] life or health." Appellant's Br. at 23. He maintains that the statute "does not envision intentional acts including battery." *Id.* at 24. In essence, Hallman contends that, while the evidence might support his commission of a battery against Z.H., it does not support his placement of Z.H. in a situation that endangered him. We cannot agree.

[20] This court rejected the same argument made by the appellant in *Eastman v. State*, 611 N.E.2d 139, 140 (Ind. Ct. App. 1993). In *Eastman*, as here, the defendant was caring for her infant when he was found to be "limp, gray, having difficulty breathing and his eyes were fixed." *Id.* When Eastman appealed her conviction for neglect of a dependent, she argued that, "while she might have been charged with battery concerning [the infant], neglect was an inappropriate charge and one not sustained by the evidence." *Id.* We rejected that claim and held as follows:

> Clearly, Eastman had the care of her dependent, Dennis, and the boy suffered serious bodily injury. There is a reasonable inference from the evidence that Eastman knowingly or intentionally inflicted the injury to the boy's skull. In doing so she placed him in a situation that endangered his life or health. That is what the statute proscribes.

*Id.* at 141.

Likewise, here, Hallman had the care of his dependent, Z.H., and Z.H. suffered serious bodily injury that led to his death. There is a reasonable inference from the evidence that Hallman knowingly or intentionally inflicted the injury to the boy's skull. In so doing, he placed him in a situation that endangered his life or health, and the evidence is sufficient to prove that element of the offense. *See id.*

*Identity*

Hallman asserts that, while the evidence "may have demonstrated the *opportunity* for Hallman to commit the act—and while the circumstances under which it occurred may have been *suspicious*[,]" the State presented insufficient evidence to prove that he was the person who injured Z.H. and caused his death. Appellant's Br. at 26 (emphases original). But Hallman merely asks that we reweigh the evidence, which we will not do.

The State presented evidence that someone inflicted a blow to Z.H.'s head that caused him to stop breathing, and the State presented expert testimony that the onset of Z.H.'s symptoms after the blow would have been "very quick." Tr. Vol. 2 at 53. Jennings testified that, at approximately 10:15 a.m. on October 22, 2015, she left Z.H. in Hallman's care in their living room while Foltz was sleeping upstairs. Only seven minutes later, Hallman called 9-1-1 to report that Z.H. had stopped breathing. We hold that the State presented sufficient evidence to prove that Hallman was the person who inflicted the fatal blow to Z.H.'s head.

### *Issue Four: Abuse of Discretion in Sentencing*

[24] Hallman contends that the trial court abused its discretion when it sentenced him. Sentencing decisions lie within the sound discretion of the trial court. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Gross v. State*, 22 N.E.3d 863, 869 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*.

[25] A trial court abuses its discretion in sentencing if it does any of the following:

> (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law."

*Id.* (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490-491 (Ind.), *clarified on reh'g other grounds*, 875 N.E.2d 218 (Ind. 2007)).

[26] The sentencing range for a Level 1 felony is twenty years to forty years, with an advisory sentence of thirty years. I.C. § 35-50-2-4. Here, at sentencing, the trial court identified the following aggravating factors: Hallman's criminal history; his history of substance abuse; the "tender age of the victim"; the likelihood that he would reoffend; and previous attempts at rehabilitation have failed. Tr. Vol. 3 at 92. And the trial court identified two mitigating factors: Hallman's

employment history and family support. The trial court sentenced Hallman to thirty-nine years executed.

[27] Hallman asserts that the trial court abused its discretion when it considered "hearsay evidence of prior acts of violence" Hallman had allegedly committed against children. Appellant's Br. at 29. First, as the State points out, Hallman did not object to the alleged hearsay at sentencing, and he has waived the issue for our review. Second, while the trial court addressed certain exhibits submitted by the State regarding such evidence during the sentencing hearing, the court did not rely on any of that proffered evidence in either its oral or written sentencing order. Accordingly, "we conclude that any alleged error in admitting such evidence did not affect the sentence imposed." *Prowell v. State*, 687 N.E.2d 563, 565 (Ind. 1997) (citing Indiana Trial Rule 61: "We 'must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.'").

[28] Hallman also asserts that the trial court abused its discretion when it identified as aggravating Z.H.'s "tender age" because Z.H.'s age was an element of the offense. Appellant's Br. at 31. However, as the State points out, the trial court was entitled to consider Z.H.'s "tender age" of six months given that the age element of the offense requires only that the victim be younger than fourteen years old. As our Supreme Court has observed, "[t]he younger the victim, the more culpable the defendant's conduct." *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011). We hold that the trial court did not abuse its discretion when it sentenced Hallman.

### *Issue Five: Inappropriateness of Sentence*

[29]    Finally, Hallman asserts that his thirty-nine-year executed sentence is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This Court has held that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has explained that:

> The principal role of appellate review should be to attempt to leaven the outliers . . . but not achieve a perceived "correct" result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. [*Anglemyer*, 868 N.E.2d at 494].

*Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (omission in original).

[30]    Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224. The question is not whether another sentence is more appropriate, but rather

whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[31] Hallman contends that "there is nothing aggravating about the [nature of] the offense. The severity of the crime is built into the sentencing structure." Appellant's Br. at 32. We cannot agree. Hallman inflicted a blow to the head of his six-month-old stepson causing his death, which is particularly heinous given the vulnerability of the infant and the fact that Z.H. depended on Hallman to care for him. We cannot say that Hallman's sentence is inappropriate in light of the nature of the offense.

[32] Hallman contends that his sentence is inappropriate in light of his character because, while he has a criminal history, "he does not fall into the worst class of offenses or offenders." *Id.* at 33. As we have observed,

> [a]lthough the maximum possible sentences are generally most appropriate for the worst offenders, this rule is not an invitation to determine whether a worse offender could be imagined, as it is always possible to identify or hypothesize a significantly more despicable scenario, regardless of the nature of any particular offense and offender.

*Kovats v. State*, 982 N.E.2d 409, 416 (Ind. Ct. App. 2013). By stating that maximum sentences are ordinarily appropriate for the "worst offenders," we

refer generally to the class of offenses and offenders that warrant the maximum punishment, which encompasses a considerable variety of offenses and offenders. *Id.* Accordingly, "[w]e concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character." *Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied*.

[33] We reject Hallman's suggestion that his sentence, which is one year less than the maximum sentence, is inappropriate because his character compares favorably to other, worse offenders. Hallman's criminal history includes one felony conviction for theft and three misdemeanor convictions, including battery against Jennings in 2013. Further, while incarcerated awaiting trial in this case, Hallman fought with a fellow inmate; he clogged a toilet and flooded the jail by placing his jumpsuit and a sheet down the toilet; and he exposed his penis to an officer. Hallman has not presented compelling evidence of "substantial virtuous traits or persistent examples of good character," and we cannot say that his sentence is inappropriate in light of his character. *See Stephenson*, 29 N.E.3d at 122.

[34] Hallman also asserts that his sentence is inappropriate in light of his character because "the court relied heavily on inadmissible double and triple hearsay" evidence regarding "prior crimes which were never charged." However, again, the trial court did not rely on hearsay evidence in imposing sentence. We

cannot say that Hallman's sentence is inappropriate in light of the nature of the offense and his character.

[35]    Affirmed.

Bailey, J., and May, J., concur.